UNITED STATES of America, Plaintiff,

v.

$189,825.00 IN UNITED STATES CURRENCY, Defendant,

and

Eduardo Rangel Velazquez, and Ivan Faron Velazquez, Claimants.

No. 96–CV–1084–J.

United States District Court, N.D. Oklahoma.

June 3, 1998.

Catherine J. Depew Hart, Tulsa, OK, for United States of America, plaintiff.

Keith Allen Ward, Chadwick R. Richardson, Richardson Law Firm, Tulsa, OK, Howard Dean Owens, Jr., Tulsa, OK, for Jose Vazquez, Ivan Faron Velazquez, Eduardo Rangel Velazquez, Luciano Chavez.

## ORDER [1]

JOYNER, United States Magistrate Judge.

Plaintiff, the United States of America ("the Government"), filed this *in rem* forfei-

---

1. This Order is entered pursuant to 28 U.S.C. § 636(c) and the parties' Consent to Proceed Before United States Magistrate Judge. [Doc. No. 29].

ture action seeking a judgment that the defendant currency has been forfeited to the United States pursuant to either 21 U.S.C. § 881(a)(6) or 31 U.S.C. § 5317(c). Now before the Court is Plaintiff's Amended Complaint for forfeiture and Claimants' Claims of Interest.

Claimants allege that the traffic stop and the resulting detentions and searches that lead to the discovery of the defendant currency violated the Fourth Amendment to the United States Constitution. Claimants also allege that the Government does not have probable cause under 19 U.S.C. § 1615 to forfeit the defendant property under either § 881(a)(6) or § 5317(c). The Court has previously bifurcated this action into two stages—a probable cause stage and, if necessary, a merits stage. The probable cause stage was conducted without a jury on April 27, 28 and May 1, 1998. On those dates, the Court held an evidentiary hearing and received evidence relevant to Claimants' Fourth Amendment and § 1615 challenges to the Government's forfeiture claim.[2]

After reviewing the evidence received and relevant precedent, the Court finds (1) that the stop, detention and seizure in this case did not violate the Fourth Amendment, and (2) that the Government does have probable cause under § 1615 to seek forfeiture of the defendant currency as proceeds of a drug transaction.

## I. THE STOP, DETENTIONS, SEARCHES AND SEIZURES IN THIS CASE WERE CONSTITUTIONALLY VALID.

### A. FACTUAL CONCLUSIONS[3]

Prior to May 1996, the speed limit in Oklahoma had recently increased. As a result, there had been an increased number of car accidents in Oklahoma. According to the data available to the Oklahoma Highway Patrol ("OHP"), three types of conduct were major factors contributing to the increased number of accidents—speeding, unsafe lane changes and following too closely. The OHP in Tulsa, Oklahoma decided that it would institute a special emphasis traffic control program focusing on speeding, unsafe lane change and following too closely violations.

At all relevant times, Larry Jackson was a field supervisor for and second lieutenant with Troop B of the OHP. On Friday, May 3, 1996, Lt. Jackson was patrolling Interstate 44 ("I–44") through Tulsa as part of the OHP's special emphasis program. Lt. Jackson was traveling west on I–44 and between 7:20 a.m. and 7:30 a.m. he observed a white and blue 1996 Dodge Ram pickup truck also driving west on I–44. From his rear-view mirror, Lt. Jackson observed the driver of the truck make three lane changes without using a signal. Lt. Jackson did not focus on the driver of the truck while the three lane changes were occurring. Lt. Jackson slowed his patrol car, pulled in behind the truck and witnessed a fourth lane change without a turn signal. Lt. Jackson then initiated a traffic stop for unsafe lane changes. See 47 Okla.Stat. § 11–309(1) (prohibiting lane changes without using a signal).

### 1. The First Location—Interstate 44

Lt. Jackson stopped the truck. The driver of the truck did not try to evade Lt. Jackson in any way. As he approached the truck, Lt. Jackson noticed it had Texas license plates and that a passenger had been lying down in the extended cab of the truck. The driver of the truck was a Hispanic male named Eduardo Rangel Velazquez and the passenger was a Hispanic male named Ivan Faron Velazquez. Eduardo and Ivan are the claimants in this forfeiture proceeding.

After stopping the truck, Lt. Jackson approached Eduardo, the driver of the truck, and determined that neither Eduardo nor Ivan could speak English. Lt. Jackson escorted Eduardo to his patrol car. Ivan stayed in the truck. While in the patrol car, Lt. Jackson removed his own driver's license and showed it to Eduardo and asked Eduar-

---

2. The following exhibits were admitted at the hearing: Government's exhibits 1A–1X, 2–4, 6, 15A–15GG, 16A–16B and 19; Claimants' exhibits 2–3, 4A, 5, 6, 8–10, 13, 15–17, and 34. All other exhibits were not admitted for purposes of the probable cause stage.

3. In this section, the Court will outline its factual conclusions. Facts presented at the hearing but not discussed in this section were found not to be relevant to the Court's Fourth Amendment analysis.

do if he had something similar. Eduardo responded by producing those items reflected in Government's exhibit 16B.

Government's exhibit 16B shows a visa permitting the person holding it to cross the United States/Mexico border. With a visa such as Government's exhibit 16B, the visa holder cannot travel more than 25 miles into the United States. Government's exhibit 16B also shows a Mexico driver's license for Eduardo. Lt. Jackson was not able to read these documents. He was, however, able to determine that they represented border crossing documents and a Mexican driver's license. At some point, Lt. Jackson also obtained a Texas identification card from Ivan, the passenger of the truck.

Once Lt. Jackson and Eduardo reached the patrol car, Lt. Jackson asked his dispatcher to locate a Spanish interpreter. OHP trooper Ron Davis heard the request and relayed that he had limited Spanish abilities, was near Lt. Jackson's location, and would respond to Lt. Jackson's location to see if he could assist Lt. Jackson. Trooper Davis arrived on the scene approximately 8–10 minutes after Lt. Jackson's initial stop. Unbeknownst to Lt. Jackson, the dispatcher heard Trooper Davis' response and the dispatcher did not follow through on Lt. Jackson's request for an interpreter. Once Trooper Davis arrived, he helped Lt. Jackson interpret Government's exhibit 16B. Trooper Davis also ascertained that (1) Eduardo and Ivan were from Mexico, (2) neither Eduardo nor Ivan owned the truck, and (3) Eduardo and Ivan claimed that they had been to St. Louis, Missouri and were returning to Mexico. Trooper Davis did have some trouble with the particular dialect being spoken by Eduardo and Ivan.

Lt. Jackson's patrol car was parked directly behind the truck. While waiting for Trooper Davis to arrive so that he could converse with Eduardo and Ivan, Lt. Jackson and Eduardo were seated in Lt. Jackson's patrol car. Lt. Jackson noticed that the truck's license plate frame was not aligned properly and that the left side of the truck's bumper appeared to be closer to the tailgate than the right side of the bumper.[4] This aroused Lt. Jackson's curiosity. Lt. Jackson got out of the patrol car and walked around the truck. Lt. Jackson was looking for evidence of an accident that would account for the misaligned bumper and license plate frame. He found none. During his walk around, Lt. Jackson smelled a faint odor of gasoline on the driver's side of the truck. The truck was still running. Lt. Jackson bent down and took a quick look under the truck. He saw nothing suspicious.

During his walk around, Lt. Jackson also did not see the type of luggage he thought would be carried by someone traveling from Mexico. Lt. Jackson admits, however, that he did not ask Eduardo or Ivan if they had luggage and he could not see in all places where luggage might be stored in the truck. In fact, there was a duffle bag, a pillow and a coat in the truck. The duffle bag contained two sets of clothes and some toiletries, including toiletries from a Hampton Inn. *See* Claimants' exhibit 8, 9 and 34.

Lt. Jackson also observed that the truck was fairly new, with approximately 20,000 miles on it. Lt. Jackson was also aware from his training that Dodge extended cab trucks were often used in drug trafficking because they have large gas tanks with a large opening through which items can be placed. The gas tanks in Dodge extended cab trucks have a sending unit mounted on them. This sending unit picks up the gasoline in the tank and sends it to the engine. When this sending unit is removed, there is a six inch hole in the tank. Lt. Jackson learned about Dodge truck gas tanks from monthly law enforcement bulletins he receives, including EPIC bulletins. *See* Government's exhibit 19.

---

4. Claimants have suggested throughout the proceedings in this case that there was in fact nothing wrong with the bumper, tailgate or license plate cover of the truck. Nevertheless, the Court finds Lt. Jackson's testimony regarding the truck's bumper, tailgate and license plate cover to be credible. Lt. Jackson was in the best position to observe the rear of the truck on the day of the stop. The Court is not persuaded that Lt. Jackson is lying or embellishing. The Court is also not persuaded that the exhibits relied on by Claimant's (i.e., photographs and video of the truck) undermine Lt. Jackson's testimony regarding the condition of the truck's bumper, tailgate or license plate cover.

Based on the facts known to him at this point, Lt. Jackson asks his dispatcher to call the Tulsa Police Department ("TPD") to see if the TPD would send a canine unit to his location. Lt. Jackson testified that he asked for a canine unit at this point because he was concerned that the truck was being used to transport drugs. At about the same time, Lt. Jackson requested his dispatcher to run NCIC,[5] EPIC[6] and owner's registration checks on Eduardo and Ivan. The NCIC and EPIC checks came back negative and the registration check revealed that the truck was owned by Luciano Chavez, a resident of Austin, Texas.

Officer Ronnie G. LeMaster, a canine officer with the TPD, was paged and he arrived at Lt. Jackson's location approximately 20–30 minutes after Lt. Jackson's initial stop. When Officer LeMaster arrived at the scene, morning rush-hour traffic had begun to back up on I–44. The motoring public was slowing down to see what was happening on the side of the highway. Cars were slamming on their brakes. Officer LeMaster walked around the truck once himself. Ivan was removed from the passenger side of the truck and placed in a patrol car different than the one in which Eduardo was seated. Officer LeMaster then removed his dog from his patrol car and walked the dog half way around the truck. Because of the traffic, the dog was skittish and there was no room to walk the dog around the driver's side of the truck. Officer LeMaster stopped walking his dog around the truck because he determined that the truck's current location threatened his safety, his dog's safety, and the motoring public's safety. The truck could not be moved further off I–44 because it was stopped next to an embankment and a guardrail.

The length of the stop at the first location was approximately 45 minutes. Lt. Jackson admits that neither Eduardo nor Ivan were free to leave the first location. Neither Lt. Jackson nor Officer LeMaster testified that Eduardo and Ivan were nervous. Eduardo was quiet and Ivan appeared to be sleepy.

## 2. The Second Location— Parking Lot Off I–44

Lt. Jackson and Officer LeMaster agreed to move the truck to a parking lot at the next I–44 exit. By this time, Lt. Jackson had returned Eduardo's and Ivan's credentials. Lt. Jackson moved the truck approximately ¼ –⅛ mile to a parking lot directly off the next I–44 exit. While the truck was being moved, Officer LeMaster asked the TPD dispatcher to send an interpreter who could speak Spanish.

Trooper Davis explained to Eduardo and Ivan in Spanish that a dog was going to be walked around the truck, that they were being detained for investigative purposes and that they should remain calm. All people were moved away from the truck and Officer LeMaster retrieved his dog from his patrol car and walked the dog around the truck twice. The truck's engine was still running. The dog alerted on the passenger-side door seam in both walk-arounds. Officer LeMaster then opened the passenger-side door and the dog alerted on the floor board and seat.[7] Officer LeMaster then returned his dog to the patrol car.

Officer LeMaster then conducted a thorough search of the interior of the truck's cab. While squatting down on the passenger side to look under the seat, Officer LeMaster smelled a strong odor of gasoline. Officer LeMaster's search of the interior of the cab did not last long because the strong odor of gasoline shifted his attention to the underside of the truck.

**5.** NCIC is an acronym for the National Crime Information Center operated by the Federal Bureau of Investigation.

**6.** EPIC is an acronym for El Paso Information Center. EPIC is an agency of the federal government within the Department of the Treasury. EPIC gathers information for use by all law enforcement agencies. It maintains records of border crossings. It also gathers intelligence about drug trafficking, including information about vehicles known or suspected to be involved with drugs.

**7.** At the time of the stop, Office LeMaster had been handling drug detection dogs for more than 25 years. Officer LeMaster and the dog had been together approximately 9 months at the time of the stop. The dog was trained to alert on the odor of marijuana, cocaine, heroin, or methamphetamine.

Officer LeMaster looked under the truck and saw gas leaking onto the ground. Officer LeMaster also noticed that the support straps for the truck's gas tank were not in their original position. Officer LeMaster then walked around to the driver's side, and between the cab and the bed he saw that one of the gas tank's yellow carrying straps was broken and was sticking up between the cab and the bed. Officer LeMaster looked under the truck again and noticed what he believed to be wrench and tool markings on several bolts, indicating to him that the bed of the truck had been on and off several times.

Lt. Jackson also searched the truck while Officer LeMaster was searching the truck. Lt. Jackson looked in the glove box, under the seats, around the dash, in the speaker wells, etc. Lt. Jackson was searching for false compartments. Lt. Jackson found receipts, toll tickets, and border crossing documents. Government's exhibit 16A was discovered during this search.[8] During the search, Lt. Jackson saw the broken, yellow gas tank strap sticking up between the cab and the bed of the truck. Lt. Jackson also smelled gasoline. Lt. Jackson looked under the truck and noticed something seeping down the side of the gas tank. Lt. Jackson touched his finger to the liquid and brought his finger to his nose. The liquid was gasoline. Unlike Officer LeMaster, Lt. Jackson did not see gasoline dripping on the ground. Lt. Jackson also noticed that the support straps holding the gas tank had caused some wear on the tank, as if they had been removed and not tightened properly.

Officer LeMaster then took his nightstick and tapped it along the bottom of the truck's gas tank. At one spot the tank sounded solid and at another the tank sounded full of liquid. Lt. Jackson got into the truck, drove it forward and slammed on the brakes. Officer LeMaster tapped on the truck's gas tank again and the solid and liquid sounds had shifted. Officer LeMaster and Lt. Jackson discussed their findings with each other and

Lt. Jackson decided to move the truck to a nearby filling station so that the truck could be raised on a rack.

The length of the stop at the second location was approximately 20 to 30 minutes. Eduardo and Ivan were in separate patrol cars while at the second location. According to Lt. Jackson, Eduardo and Ivan were never free to leave the second location.

### 3. The Third Location—Phillips 66 Filling Station

Lt. Jackson drove the truck approximately three miles to a Phillips 66 filling station that was equipped with vehicle racks. The truck was raised on a rack and its underside was inspected thoroughly. Lt. Jackson and Officer LeMaster both observed tool marks, grease marks, scratches on the frame, and missing bolts. These markings indicated to Lt. Jackson and Officer LeMaster that the bed of the truck had been off and on several times. Lt. Jackson testified that based on his training, he was aware that those using a Dodge truck gas tank to conceal contraband often removed the bed of the truck to access the gas tank, rather than remove the gas tank itself, because it was easier.

Lt. Jackson removed the truck's gas tank. The sending unit attached to the tank was not secured tightly. The sending unit was removed from the tank. Once the sending unit was removed, Lt. Jackson saw several plastic bundles in the gas tank. See Government's exhibits 1R–1V. Eleven bundles of money were removed from the tank. Each bundle was wrapped in three layers of cellophane, vacuum packed, and heat sealed. See Government's exhibits 1W–1X and 15. The money was discovered within an hour of arriving at the gas station.

Shortly after the truck arrived at the Phillips 66, Demita Kinard, a Spanish-speaking interpreter with the TPD arrived at the scene in response to Officer LeMaster's earlier request for an interpreter.[9] When she

---

8. Government's exhibit 16A is a temporary permit to cross the United States/Mexico border and exceed the 25 mile limit. The temporary permit was issued in April 1996 and it expired on May 1, 1996. The temporary permit limited travel to five states—California, Arizona, New Mexico, Nevada and Texas. The temporary permit showed San Antonio, Texas as the driver's destination.

9. Officer Kinard has received training from the TPD in interpretation. Officer Kinard has an undergraduate degree in Spanish and she lived in Venezuela for four to five months.

arrived, Officer Kinard was briefed and Lt. Jackson asked her to tell Eduardo and Ivan that he was going to remove the truck's gas tank and that if no contraband was found, they would be free to leave. Officer Kinard communicated this to Eduardo and Ivan in Spanish. At the time, Eduardo and Ivan were in separate patrol cars and Officer Kinard was shuttling between cars. Lt. Jackson also asked Officer Kinard to obtain general background information from Eduardo and Ivan.

Eduardo and Ivan each told Officer Kinard the same coherent story. They both told Officer Kinard that they were returning from St. Louis, Missouri after seeing a baseball game and visiting an amusement park and that they had been paid $100.00 in gas money to drive the truck and meet Mr. Chavez, the owner of the truck, in Tulsa, Oklahoma at 10:30 a.m. that morning. Eduardo and Ivan stated that (1) Mr. Chavez owns a business that supplies fireworks for special occasions, (2) that Mr. Chavez was in Tulsa purchasing fireworks from OK Fireworks, Inc., and (3) that the fireworks purchased by Mr. Chavez were going to be transported to Laredo, Texas in the truck.

█ After the money was found, Eduardo and Ivan were handcuffed and placed under arrest.[10] Officer Kinard mirandized Eduardo and Ivan using a miranda card written in Spanish. Eduardo and Ivan were then formally placed under arrest. Officer Kinard then questioned Eduardo and Ivan to see if they knew anything about the money in the gas tank. Both denied any knowledge of the money and told Officer Kinard that they had been hired to drive the truck.

The parties were at the gas station for another hour while the truck was put back together. The truck was then transported approximately ¼ mile to OHP headquarters, where it was impounded with the motor vehicle division. Once at OHP headquarters, the money was counted and determined to be $189,825.00 in United States currency—the defendant in this forfeiture action. Lt. Jackson requested another EPIC check on the truck and determined that the truck had crossed the Mexico/United States border at Laredo, Texas on April 29, 1996. Eduardo and Ivan were later booked into the Tulsa County Jail.

The length of the stop at the third location was approximately 2 hours and 15 minutes. Eduardo and Ivan were mirandized and arrested approximately one hour after arriving at the third location. Thus, approximately 2½ to 3 hours elapsed between the initial stop and the finding of the money and the mirandizing and arrest of Eduardo and Ivan.

### B. Fourth Amendment Analysis

█ A traffic stop is a seizure within the meaning of the Fourth Amendment to the United States Constitution.[11] A traffic stop is, however, an investigative detention, not a custodial arrest. *United States v. Wood,* 106 F.3d 942, 945 (10th Cir.1997). Traffic stops are, therefore, subject to the two-pronged analysis established by the United States Supreme Court in *Terry v. Ohio,* 392 U.S. 1, 19–20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). First, the traffic stop must have been justified from its inception. That is, the vehicle must have been stopped for a legitimate law-enforcement reason. Second, the law-en-

10. The evidence regarding the handcuffing of Claimants is in dispute. Officer Kinard's testimony suggests that Claimants were handcuffed at some time prior to their arrest. Lt. Jackson's and Officer LeMaster's testimony suggests that Claimants were not handcuffed until they were arrested. Claimants have the burden of establishing facts necessary to prove that their Fourth Amendment rights have been invaded. *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939); *Wilson v. United States,* 218 F.2d 754, 757 (10th Cir.1955). Based on the conflicting testimony, the Court finds that Claimants have not established that they were handcuffed prior to their custodial arrest.

11. As the driver and passenger of the truck, Claimants have standing to challenge the *stop and detention* of the truck under the Fourth Amendment. *See United States v. Erwin,* 875 F.2d 268, 270 (10th Cir.1989). The Court also finds that Claimants have standing to challenge the *search* of the truck because the Government has not argued that the Claimants' lack standing to challenge the search of the truck. *See, e.g., United States v. Miller,* 84 F.3d 1244, 1249–50 (10th Cir.1996), *overruled* on other grounds by *United States v. Holland,* 116 F.3d 1353 (10th Cir.1997) (holding that a party lacks standing to object to the search of a vehicle if he cannot prove he is the owner of or has lawful possession of the vehicle at the time of the search).

forcement officer's actions during the detention must be reasonably related in scope to the circumstances justifying the traffic stop. *Wood,* 106 F.3d at 945.

■ Because a traffic stop is an investigatory detention and not a custodial arrest, the length of the detention must be brief and reasonable under the circumstances. The scope of the investigation must also be carefully tailored to the underlying justification for the stop. *Wood,* 106 F.3d at 945. During a traffic stop, a law-enforcement officer may ask questions about the vehicle's ownership, the identity of the vehicle's occupants, and the occupant's travel plans. *United States v. Rivera,* 867 F.2d 1261, 1263 (10th Cir.1989). An ordinary traffic stop must last no longer than is necessary to allow the law-enforcement officer to (1) investigate the alleged traffic violation, (2) run a check on the driver, (3) ensure that the driver has a valid license, (4) check the vehicle's registration and run a check on the vehicle, (5) verify that the vehicle is insured, and (6) issue citations. *Wood,* 106 F.3d at 945; *United States v. Martinez,* 983 F.2d 968, 974 (10th Cir.1992).

■ The length and scope of a valid traffic stop can be expanded beyond the basic inquiries described above only if the driver consents or if the law-enforcement officer has a reasonable suspicion, based on particularized and objective factors, for suspecting criminal activity. *United States v. McKneely,* 6 F.3d 1447, 1451 (10th Cir.1993); *United States v. Lambert,* 46 F.3d 1064, 1069 (10th Cir.1995); *Wood,* 106 F.3d at 946. The Fourth Amendment requires only a minimal level of objective justification for making an investigative detention. Considerably less than proof of wrongdoing by a preponderance of the evidence, but something more than an inchoate and unparticularized suspicion or hunch, is required. *Wood,* 106 F.3d at 946.

■ A law-enforcement officer's reasonable suspicion of further criminal activity may be based on the common sense and ordinary human experience of all the law-enforcement officers at the scene. Officers properly investigating one kind of offense are not required to ignore suspicious circumstances suggesting the commission of other kinds of offenses. *See, e.g., United States v.*

*Jones,* 44 F.3d 860 (10th Cir.1995); and *United States v. Arango,* 912 F.2d 441 (10th Cir.1990). Whether an officer's suspicion is reasonable is determined from the totality of the circumstances he has observed, and no one factor is controlling. *United States v. Soto,* 988 F.2d 1548, 1555 (10th Cir.1993). The Court will defer to a law-enforcement officer's ability to distinguish between innocent and suspicious actions. *United States v. Lopez–Martinez,* 25 F.3d 1481, 1481 (10th Cir.1994).

### 1. Validity of The Stop—*Terry* Step One

■ Lt. Jackson testified that he stopped the truck because he had observed the driver of the truck make four lane changes without signaling. At the evidentiary hearing, Claimants suggested that Lt. Jackson's stop was a pre-textual stop. Claimants allege that Lt. Jackson stopped the truck because the driver was Hispanic, and not because a traffic offense had been committed. Claimants' allegation that the initial stop was pre-textual must be analyzed using the standard articulated by the Tenth Circuit in *United States v. Botero–Ospina,* 71 F.3d 783 (10th Cir.1995).

The Tenth Circuit adopted the following standard in *Botero–Ospina:*

> [A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring. It is irrelevant, for purposes of Fourth Amendment review, 'whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop.' It is also irrelevant that the officer may have had other subjective motives for stopping the vehicle. Our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction....
>
> ....
>
> It goes without saying that, by adopting the standard we do today, we do not aban-

don the traveling public to 'the arbitrary exercise of discretionary police power.' Our holding in this case properly focuses on the very narrow question of whether the initial stop of the vehicle is objectively justified. We leave intact the vast body of law which addresses the second prong of the *Terry* analysis—whether the police officer's actions are reasonably related in scope to the circumstances that justified the interference in the first place.; Our well-developed case law clearly circumscribes the permissible scope of an investigative detention. Therefore, if an officer's initial traffic stop, though objectively justified by the officer's observation of a minor traffic violation, is motivated by a desire to engage in an investigation of more serious criminal activity, his investigation nevertheless will be circumscribed by *Terry's* scope requirement.

*Botero–Ospina,* 71 F.3d at 787–88 (internal footnotes and citations omitted). *See also, Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996) (holding that subjective intentions play no role in Fourth Amendment analysis and that a law-enforcement officer's subjective motivation will not invalidate objectively justifiable behavior).

Applying *Botero–Ospina* in this case, the Court finds that the initial stop of the truck was valid. Lt. Jackson stopped the truck because he observed a violation of Oklahoma's traffic laws. *See* 47 Okla.Stat. § 11–309(1).[12] Nothing more is required to satisfy the *Botero–Ospina* standard. Lt. Jackson's subjective intentions are irrelevant. Lt. Jackson also testified that on the day in question, the OHP was focusing on speeding, following too closely and unsafe lane change violations. It is, therefore, entirely credible that Lt. Jackson would be watching for and stopping drivers making unsafe lane changes. Claimants make much of the fact that Lt.

Jackson observed three of the four lane changes from his rear-view mirror in rush-hour traffic. Given Lt. Jackson's training and 13 years of experience patrolling Oklahoma highways for traffic violations, the Court finds it entirely credible that Lt. Jackson could and did observe three lane changes from his rear-view mirror in rush-hour traffic.

### 2. Duration of The Stop and Scope of The Investigation—*Terry* Step Two

■ Based on the facts of this case, the Court finds that Lt. Jackson's stop for an unsafe lane change justified the detention in this case until shortly after Trooper Davis arrived and helped Lt. Jackson communicate with Eduardo and Ivan and helped Lt. Jackson interpret the documents he had been given by Eduardo and Ivan. Unlike most traffic stops, this stop was complicated by the language barrier between Lt. Jackson, Eduardo and Ivan. Lt. Jackson was justified in detaining Eduardo and Ivan until he could obtain some assistance from a Spanish-speaking officer.

■ Once Trooper Davis arrived and helped Lt. Jackson converse with Eduardo and Ivan and once Lt. Jackson had received reports back on the routine checks he had requested, Lt. Jackson was obligated to issue a citation and release Eduardo and Ivan. Lt. Jackson was justified in extending Eduardo's and Ivan's detention for the canine sniff only if Eduardo and Ivan consented or if Lt. Jackson had a reasonable suspicion, based on particularized and objective factors, for suspecting additional criminal activity. Eduardo and Ivan did not consent to any additional detention or any searches of the truck. Thus, Lt. Jackson's further detention of the truck will be deemed reasonable only if the Government can point to particularized and objective factors which would form the basis for a reasonable suspicion that the truck was

---

**12.** Section 11–309 provides as follows:

Driving on roadways laned for traffic

Whenever any roadway has been divided into two or more clearly marked lanes for traffic, the following rules in addition to all others consistent herewith shall apply.

1. A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that the movement can

be made with safety and then given a signal, not less than the last one hundred (100) feet traveled by the vehicle, of his intention to change lanes.

42 Okla.Stat. § 11–309(1). This section requires that a signal be given for at least 100 feet of travel before any lane change is attempted. Thus, changing lanes without a signal is a violation of this section.

involved in a violation of local, state or federal drug laws.

This case is distinguishable from *United States v. Morales–Zamora*, 914 F.2d 200 (10th Cir.1990). In *Morales–Zamora*, the vehicle was subject to a canine sniff, but the sniff was completed within the time it took the stopping-officer to complete a license, registration and insurance check. In this case, Officer LeMaster may have arrived at a time that required no additional justification for a canine sniff. Officer LeMaster was, however, unable to conduct a proper canine sniff on the highway. To conduct a proper sniff, the truck had to be moved off the highway. The additional detention needed to accomplish this move must be justified by a reasonable suspicion.

After reviewing the testimony and the evidence in this case, the Court is convinced that Lt. Jackson had a reasonable suspicion sufficient to permit him to detain the truck, move it a short distance off the highway, and subject it to a brief sniff by a canine. Lt. Jackson was aware of and observed the following factors:

1. From his training and experience, Lt. Jackson was aware that the gas tanks of Dodge trucks were often used to conceal contraband.

2. The truck's bumper/tailgate and license plate cover appeared to be out of alignment and there was no evidence the truck had been in an accident.

3. A gasoline odor was emanating from the truck.

4. Neither the driver nor the passenger owned the truck, which was registered to an Austin, Texas resident.

5. The truck was less than six months old and had 20,000 miles on it.

6. The truck was traveling on I–44, a known drug courier route.

7. Both the driver and the passenger were Mexican nationals who could not speak English and who did not have in their possession visas permitting them to be where they were and claimed to have been.

The Court finds that these factors, listed in order of descending relevance, taken in the aggregate provided Lt. Jackson, a trained law-enforcement officer, with a reasonable suspicion to expect that the truck was involved in a violation of local, state or federal drug laws.

 As with any investigatory detention based on reasonable suspicion, a detention for a canine sniff must last no longer than necessary to call a dog to the scene and quickly confirm or dispel the reasonable suspicion. *See United States v. Place*, 462 U.S. 696, 709–710, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). Lt. Jackson requested a canine unit and Officer LeMaster was dispatched. Officer LeMaster arrived at the first location and quickly determined that the truck needed to be moved off the highway. The Court finds that Officer LeMaster's safety concerns to be credible and legitimate. The truck was moved to the second location and the exterior of the truck was immediately subjected to a canine sniff. All of this occurred within 30–35 minutes. The Court finds that under the circumstances of this case, a 30–35 minute detention to confirm or dispel Lt. Jackson's reasonable suspicion was not unreasonable. *See United States v. Brown*, 24 F.3d 1223, 1226 (10th Cir.1994) (holding that a 30 minute detention based on reasonable suspicion was not a *per se* unreasonable amount of time to wait for a canine sniff). The total detention from initial stop to canine sniff was also slightly less than an hour. This also is not an unreasonable amount of time given the circumstances of this case. *See, e.g., Place*, 462 U.S. at 709–710, 103 S.Ct. 2637 (finding a 90 minute investigative detention to be unreasonable).[13]

 Law-enforcement officers may conduct warrantless searches of vehicles once

---

**13.** Canine sniffs of a vehicle are not searches within the meaning of the Fourth Amendment if the sniff is carried out while the vehicle is being lawfully detained. Thus, a particularized showing of a reasonable suspicion of drug-related criminal activity is not required. This is true even if the vehicle is being detained for reasons wholly unrelated to drug-related activity. *United States v. Morales–Zamora*, 914 F.2d 200 (10th Cir.1990). Nevertheless, the Court has required a reasonable suspicion of drug-related criminal activity in this case not to support a canine sniff, but because the length of the detention had to be expanded beyond what would have been reasonable in light of the reasons justifying the initial stop (i.e., unsafe lane changes).

they have probable cause to believe that the vehicle contains drugs. This is true even if there are no exigent circumstances and even if the officer has time and an opportunity to obtain a warrant. *United States v. Ludwig*, 10 F.3d 1523, 1528 (10th Cir.1993). A positive alert from a trained drug-sniffing canine, without more, provides law-enforcement officers with probable cause to search a vehicle for drugs. A positive canine alert is itself reliable enough to provide a fair probability that contraband may be found in the vehicle. *Id.* at 1527 (citing several cases). Officer LeMaster's dog alerted on the exterior door seam on the passenger side of the truck. This positive alert provided Officer LeMaster and Lt. Jackson with probable cause to conduct a warrantless search of the truck, including a search of the interior of the truck with the dog.

■ During the comprehensive search of the truck, the canine alerted on the interior of the truck. Lt. Jackson and Officer LeMaster also smelled a stronger odor of gasoline and they noticed (1) the straps supporting the truck's gas tank had been moved, (2) one of the gas tank's yellow carrying straps was broken, (3) gas was leaking down the side of the gas tank, and (4) various tool markings on the underside of the truck.[14] Tapping on the gas tank with a nightstick also suggested that something was in the truck's gas tank. These facts, together with Lt. Jackson's observations while on the high-

way, provided Lt. Jackson with probable cause to believe that contraband of some type was being hidden in the gas tank. Lt. Jackson was justified, therefore, in seizing the truck, transporting it a short distance to a garage, and removing the gas tank to determine if it in fact contained contraband.

Based on the totality of the circumstances present in this case, the Court finds that the stop and detention of Claimants and the search and seizure of the truck were not conducted in violation of the Fourth Amendment. Claimants' motion to apply the exclusionary rule and suppress certain evidence in this case is, therefore, denied.

## II. THE GOVERNMENT HAS PROBABLE CAUSE TO SEEK FORFEITURE OF THE DEFENDANT CURRENCY UNDER 21 U.S.C. § 881(a)(6), BUT NOT UNDER 31 U.S.C. § 5317(c).

Section 881(a)(6) permits the Government to forfeit currency that is intended to be used to purchase a controlled dangerous substance or is proceeds from the sale of a controlled dangerous substance. Section 5317(c) permits the Government to forfeit currency if currency in excess of $10,000.00 was transported or about to be transported across a United States border without filing the International Transportation of Currency or Monetary Instrument Report ("ITCMIR") required by 31 U.S.C. § 5316 and 31 C.F.R. §§ 103.23 and 103.27.[15]

---

14. Much of what the Lt. Jackson and Officer LeMaster saw was arguably within plain view on the underside of the truck, and looking at items in plain view is not a search. *See, e.g., United States v. Rascon–Ortiz*, 994 F.2d 749, 754 (10th Cir.1993); and *United States v. Gonzalez–Acosta*, 989 F.2d 384, 387–388 (10th Cir.1993). The Court need not, however, decide this issue because the Court has determined that Lt. Jackson and Officer LeMaster had probable cause to conduct a thorough search of the truck.

15. Section 881 provides as follows:
 The following shall be subject to forfeiture to the United States and no property right shall exist in them:
 (6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and se-

curities used or intended to be used to facilitate any violation of this subchapter....
21 U.S.C. § 881(a)(6).
 Section 5317 provides as follows:
 If a report required under section 5316 with respect to any monetary instrument is not filed (or if filed, contains a material omission or misstatement of fact), the instrument and any interest in property, including a deposit in a financial institution, traceable to such instrument may be seized and forfeited to the United States Government.... A monetary instrument transported by ... messenger, or bailee is being transported under this subsection from the time the instrument is delivered to the messenger, or bailee through the time it is delivered to the ... intended recipient, of agent of the ... intended recipient without being transported further in, or taken out of, the United States.
31 U.S.C. § 5317(c).
 Section 5316 provides as follows:
 (a) [A] person or an agent or bailee of the person shall file a report under subsection

■ The burden of proof in this case is allocated pursuant to 19 U.S.C. § 1615. Section 1615 states that in forfeiture actions "the burden of proof shall lie upon [the] claimant ... [p]rovided, [t]hat probable cause shall be first shown for the institution of such suit or action, to be judged of by the court...." *Id.*

The test for determining probable cause for forfeiture purposes is the same as applies in arrests, searches and seizures. Accordingly, the government must demonstrate a reasonable ground for belief of guilt supported by less than prima facie proof, but more than mere suspicion. 'Circumstantial evidence of drug transactions may support the establishment of probable cause.' However, the presence or absence of any single factor is not dispositive. Once probable cause for forfeiture has been established, claimants may recover the defendant property only by establishing a defense to forfeiture by a preponderance of the evidence.

*United States v. $149,442.43 in U.S. Currency,* 965 F.2d 868, 876–877 (10th Cir.1992) (internal citations and footnotes omitted). The Government must, therefore, demonstrate to the Court's satisfaction that the Government has probable cause to believe that the defendant currency is subject to forfeiture under 21 U.S.C. § 881(a)(6) and 31 U.S.C. § 5317(c).

(b) of this section when the person, agent, or bailee knowingly—
(1) transports, is about to transport, or has transported, monetary instruments of more than $10,000 at one time—
(A) from a place in the United States to or through a place outside the United States; or
(B) to a place in the United States from or through a place outside the United States; or
(2) receives monetary instruments of more than $10,000 at one time transported into the United States from or through a place outside the United States.
(b) A report under this section shall be filed at the time and place the Secretary of the Treasury prescribes. The report shall contain the following information to the extent the Secretary prescribes:
(1) the legal capacity in which the person filing the report is acting.
(2) the origin, destination, and route of the monetary instruments.

## A. PROBABLE CAUSE TO FORFEIT UNDER 31 U.S.C. § 5317(c).

The Government's amended complaint alleges that the defendant currency "was transported to a place in the United States from or through a place outside the United States without the filing of a report pursuant to 31 U.S.C. § 5316(b)." [Doc. No. 68, p. 2, ¶ 4]. Neither the Government's Trial Brief, filed before the evidentiary hearing, nor its Brief in Support of a Finding of Probable Cause, filed after the evidentiary hearing, address why the Court should find that the Government has probable cause to believe that the defendant currency was transported from a place outside the United States to a place inside the United States. [Doc. Nos. 90 and 99]. The Government presented no evidence at the evidentiary hearing which would establish that the defendant currency was ever in Mexico or any country other than the United States. The Court finds that the Government has failed to establish that it has probable cause to forfeit the defendant currency under 31 U.S.C. § 5317(c). That portion of the Government's Amended Complaint seeking forfeiture of the defendant currency under § 5317(c) is, therefore, dismissed with prejudice.

## B. PROBABLE CAUSE TO FORFEIT UNDER 21 U.S.C. § 881(a)(6).

■ The Government's amended complaint alleges that the defendant currency

(3) when the monetary instruments are not legally and beneficially owned by the person transporting the instruments, or if the person transporting the instruments personally is not going to use them, the identity of the person that gave the instruments to the person transporting them, the identity of the person who is to receive them, or both.
(4) the amount and kind of monetary instruments transported.
(5) additional information.
31 U.S.C. § 5316(a) and (b). *See also* 31 C.F.R. §§ 103.11, 103.3, 103.27 and 103.48. Claimants have stipulated that the Defendant currency is a "monetary instrument" as that term is defined in 31 U.S.C. § 5312(a)(3). Section 5312, 5316 and 5317 are part of the Currency and Foreign Transactions Reporting Act ("CFTRA"). The report required by § 5315(b) is known as an International Transportation of Currency or Monetary Instrument Report ("ITCMIR").

"was furnished, or intended to be furnished, in exchange for a controlled substance, or is proceeds traceable to such an exchange, or is money used, or intended to be used, to facilitate a violation of Title 21 of the United States Code...." [Doc. No. 68, p. 2, ¶ 4]. The Government has offered no evidence to establish that the defendant currency was "furnished or [was] intended to be furnished" in exchange for drugs. The Government has also offered no evidence that the defendant currency was "used or intended to be used" to violate a specific provision of Title 21. The Government only offered evidence that the defendant currency is "proceeds traceable" to the sale of drugs. That portion of the Government's Amended Complaint seeking forfeiture of the defendant currency under § 881(a)(6) as money that was to be furnished for drugs or money that was to be used to violate a specific section of Title 21 is, therefore, dismissed with prejudice. The Government may forfeit the defendant currency only as proceeds traceable to the sale of drugs.

The Court has reviewed the numerous cases cited by the parties regarding the probable cause necessary to forfeit currency as drug proceeds under § 881(a)(6). The Government has introduced sufficient evidence to establish probable cause to believe that the defendant currency is the proceeds of the sale of a controlled dangerous substance. While certain factors in isolation may only have marginal relevance, no one factor controls. The Court is convinced that in the aggregate the following factors are sufficient to sustain the Government's burden and require Claimants' to come forward and demonstrate that the defendant currency is not the proceeds of an illegal drug transaction:

1. The money was hidden in the gas tank of a Dodge pickup truck. Dodge pickup trucks are frequently used by drug traffickers because the large gas tank and gas tank openings make it easy to conceal drugs and drug proceeds. Gas tanks are often used to conceal drug proceeds because the gas and the tank help mask the odor of drugs. See testimony of Lt. Jackson, Michael H. Woods, a Sargent with the Missouri Highway patrol who testified for the Government, and James E. Judd.

2. Mexico is a known transit zone for drugs headed to the United States from Central and South American countries and for drug proceeds headed to Central and South American countries from the United States. See testimony of James E. Judd.[16]

3. Several characteristics of the drug courier profile are present. See testimony of Lt. Jackson, Agent Judd and Sgt. Woods.

 a. The truck was being driven by two Mexican nationals who did not have proper visas and who did not own the truck. The owner of the truck was not present and Claimants disavowed any knowledge of the currency when it was found in the truck's gas tank.

 b. The truck was headed south on Interstate 44 from an interior state to Mexico, a border state. I–44 is known to law-enforcement agencies as a drug pipeline or drug courier route. See testimony of Sgt. Woods.

 c. The driver and passenger of the truck had been on a long trip allegedly for recreation, but only had a brief stay at their claimed destination before beginning the return trip.

 d. Neither the driver nor the passenger had criminal records.

 e. The truck was relatively new with high mileage.

 f. There is some evidence to suggest that the bed of the truck had been on and off several times.

 g. It is common for there to be two passengers so that one can driver and one can sleep while the other is driv-

16. Agent Judd is an ex-FBI and Border Patrol agent and he is currently an assistant to the Drug Czar. Agent Judd currently advises the President on better and more efficient methods to interdict drugs coming into the United States and drug proceeds leaving the United States. Agent Judd has been involved with the investigation of drug-related offenses for most of his 25 year career. Agent Judd was qualified as an expert on drug-related matters under Fed.R.Evid. 702 and the Court finds his testimony credible.

ing. This permits long distances to be covered in a short time.

4. The large amount of currency involved.

5. The fact that Officer LeMaster's drug-sniffing canine hit on the exterior and interior of the truck, indicating the presence of drugs in the truck at some time.

6. The unique packaging of the currency—triple-wrapped in cellophane, heat-sealed and vacuum-packed. Agent Judd testified credibly that out of the numerous currency seizures he has made, assisted or witnessed, the only currency he has seen packaged the way the defendant currency was packaged is currency that had some connection to drugs. Agent Judd testified that he had never seen currency packaged the same as the defendant currency that was not connected to drugs. According to Agent Judd, currency is packed the way the defendant currency was packaged for two reasons: two mask the odor of drugs and to prevent the cash from mildewing as the cash makes its way through the jungles of Mexico and Central and South America. See also testimony of Sgt. Woods.

### CONCLUSION

Claimants' request to suppress certain evidence as the fruit of a stop, detention, search or seizure in violation of the Fourth Amendment to the United States Constitution is denied. The Court finds that based on the totality of the circumstances, the stop, detentions, searches and seizures in this case were valid under the Fourth Amendment. The Government has failed to establish that it has probable cause to forfeit the defendant currency under 31 U.S.C. § 5317(c) as currency that crossed from Mexico into the United States without the filing of an ITCMIR. The Government has failed to establish probable cause to forfeit the defendant currency under 21 U.S.C. § 881(a)(6) as currency that was "furnished or [was] intended to be furnished" in exchange for drugs. The Government has failed to establish probable cause to forfeit the defendant currency under 21 U.S.C. § 881(a)(6) as currency "used or intended to be used" to violate a specific provision of Title 21. Those portions of the Government's amended complaint are, therefore,

dismissed with prejudice. The Government has established probable cause to forfeit the defendant currency under 21 U.S.C. § 881(a)(6) as currency that is proceeds traceable to a sale of drugs.

**The Court will conduct a jury trial to allow Claimants to establish by a preponderance of the evidence that the defendant currency is not subject to forfeiture under 21 U.S.C. § 881(a)(6) as the proceeds of a drug transaction. Trial will begin July 20, 1998 at 9:30 a.m. If Claimants intend to call Maria Elena Navarette De Garza as a witness at trial, they must cooperate with the Government in producing her for a deposition to be taken prior to June 27, 1998. A pre-trial conference will be held on July 7, 1998 at 10:30 a.m. Proposed jury instructions and proposed *voir dire* shall be submitted no later than June 29, 1998.**

IT IS SO ORDERED.