**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jose Rodolfo AYON–MEZA,
Defendant–Appellant.**

**United States of America,
Plaintiff–Appellee,**

v.

**Alcadio Ayon–Meza, Defendant–
Appellant.**

**Nos. 97–10354, 97–10391.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 27, 1999.

Filed May 18, 1999.

Elizabeth Fisher and Jerry Wilson, Honolulu, Hawaii, for the defendants-appellants.

Michael Kawahara, Assistant United States Attorney, Honolulu, Hawaii, for the plaintiff-appellee.

Before: FARRIS, NOONAN, and GRABER, Circuit Judges.

NOONAN, Circuit Judge:

Jose Rodolfo Ayon–Meza (Jose) and Alcadio Ayon–Meza (Alcadio) entered conditional pleas of guilty to charges of conspiracy and possession with intent to distribute approximately 4,995.3 grams of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and were sentenced accordingly. Their pleas were conditional in that they reserved the right to appeal the ruling of the district court, after a hearing, that the evidence against them should not be suppressed. The sole issue before us is whether the challenged evidence was secured in violation of the Fourth Amendment.

Each case involving a Fourth Amendment claim presents a slightly different configuration of facts. There is some inclination to publish an opinion only when we are reversing, but it is helpful for both the district courts and law enforcement agencies to have before them examples of permissible procedures. We therefore publish this affirmance.

### FACTS AND PROCEEDINGS

The following facts are taken from the affidavit sworn to by Tanya Tano, an officer of the Honolulu Police Department, on August 10, 1996, and from her testimony at the later suppression hearing. There are only minor, insubstantial discrepancies between her two statements, which are essentially unchallenged. No defendant testified. Tano is the only witness to the following events:

On August 9, 1996, at about 12:30 p.m., Tano and National Guard Sergeant Clifford Chee were at the Honolulu International Airport en route to Gate 27 at about the scheduled arrival time of a flight from

Los Angeles. Tano noticed a man, later identified as Guillermo Barrera–Galvan, walking rapidly on the mauka or mountain side of the breezeway, heading toward the main terminal. Periodically Barrera turned his head to look back at a man, later identified as Jose, walking 30 feet behind him. Tano noticed that this second man, who also was walking rapidly, kept turning back to look at a third person, later identified as Alcadio. Tano observed that the three persons, while maintaining a significant distance between one another, were synchronizing their movements. Each man was carrying a shoulder bag.

Tano and Chee, walking on the makai or seaward side of the breezeway, passed the three men and then turned to follow them at a distance of about 40 feet. At the escalator Barrera waited for Jose to catch up with him and spoke to him briefly before going down the escalator. Jose stopped and looked back at Alcadio before going down the escalator himself. The three men moved through the baggage claim area without picking up baggage. Then they crossed the street to the taxi waiting area, where they appeared to be talking to each other. Jose and Barrera were standing next to each other, with Alcadio standing behind Jose.

Tano approached them and identified herself as a police officer to Barrera and Jose, displaying her police identification card. She said, "Can I talk to you for a few minutes?" Barrera said, "Yes." Jose nodded. She explained that she was investigating drug trafficking at the airport and talked to people from certain flights. She told them they were not under arrest and were free to leave and that they did not have to talk to her if they didn't want to. Barrera and Jose nodded their heads. Alcadio, who appeared to be listening to the conversation, began to sidestep and then back-step away from the others while still watching them.

Tano asked Barrera and Jose whether she could see their airline tickets. They gave the tickets to her. Barrera's had been purchased the day before for cash in

Santa Ana; it was a one-way ticket bought at Metro Travel in Santa Ana, California. Jose's one-way ticket also was purchased the day before, for cash, from Metro Travel in Santa Ana, California. The lengthy serial numbers on the tickets were the same except for the last digit, which in Barrera's case was "5" and in Jose's case was "3." Tano inferred that they were traveling together and asked them if they were. They looked at each other and then at her and simultaneously said, "No." She concluded that they were lying. She also asked them whether either of them was traveling with Alcadio, who had continued to move slightly away and was now 15 feet from where the others were standing. Alcadio, as he backed away, continued to watch Tano, Barrera, and Jose. Barrera and Jose did not reply immediately. They looked at Alcadio several times and finally said, "No." Tano again concluded that they were lying.

Tano asked to see Jose and Barrera's identification cards, which they showed her. She then repeated that she was investigating drug trafficking at the airport and asked Barrera if he was carrying any drugs. He patted his stomach and said, "Nothing." Meanwhile, Jose was edging away, slowly, and was about 8 feet from Barrera. Tano asked Barrera whether she could look in his bag, which he had put down on the sidewalk in such a way that he was between the bag and her. Without saying anything, Barrera squatted and unzipped the main compartment and began shifting clothing items quickly from one side to the other. As he moved the contents, he said, "There's nothing, see, there's nothing." Tano, however, saw the corner and side of a bundle, which was either rectangular or square and which was heavily wrapped in silver duct tape. The bundle was within a folded pair of pants and, as Barrera moved the pants back and forth, she could tell that the pants folded over a bundle that was about 10 inches long and at least 3 to 4 inches in width. Based on her training and experience and on her observations to this point,

Tano concluded that the bundle was a kilogram-size container of illegal drugs. At this point, approximately 12:45 p.m., she placed Barrera and Jose under arrest and signaled to Sergeant Chee to arrest Alcadio. She then looked into Barrera's still-open bag and saw another similar bundle, similarly wrapped in silver-colored duct tape. She also took possession of the other bags but did not search them.

At about 12:55 p.m. Barrera, Jose, and Alcadio were brought to the police office. Alcadio's bag and Jose's bag were presented to the narcotics detector dog, Woody, who alerted to each bag, indicating the probable presence of illegal drugs. The bundles from Barrera's bag were examined and found to contain a white powdery substance that, when tested, proved to be cocaine. At about 5:00 p.m., after he had been advised of his constitutional rights and asked if he were willing to answer questions, Alcadio informed a police officer that he had "the same" as Barrera.

On the basis of the foregoing information, Tano sought a search warrant to examine Alcadio's and Jose's bags. The warrants were issued. One kilogram of cocaine was found in Jose's bag, and two kilograms of cocaine were found in Alcadio's bag.

Barrera, Jose, and Alcadio all were charged with conspiracy and possession with intent to distribute cocaine. Barrera pleaded guilty unconditionally. Jose and Alcadio filed pretrial suppression motions. The district court ruled that there had been probable cause for Tano to arrest them. They appeal.

*ANALYSIS*

■ Jose and Alcadio first challenge the "walk and talk" procedure in which Tano made her initial contact with them. It is argued that, although in form consensual, the approach was in fact coercive, the defendants yielding to the pressure exerted by a police officer showing her identification and asking if they were willing to speak. This objection, of course, cannot be made by either Jose or Alcadio as to

Barrera, nor can it be made by Alcadio as to Jose; one cannot vicariously assert the Fourth Amendment rights of another. *See United States v. Padilla,* 508 U.S. 77, 81, 113 S.Ct. 1936, 123 L.Ed.2d 635 (1993).

■ Looking at Jose's objection on his own account, we must recognize that there is an element of psychological inducement when a representative of the police—even unarmed and in civilian clothes, as Tano was—initiates a conversation. But it is not the kind of psychological pressure that leads, without more, to an involuntary stop. *See United States v. Woods,* 720 F.2d 1022, 1026 (9th Cir.1983). It is even further from an arrest. Accordingly, the Fourth Amendment has no application. *See United States v. Mendenhall,* 446 U.S. 544, 553–55, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

■ The defendants next contend that Tano lacked probable cause to arrest either of them. To the contrary, she had reason to conclude from her observations that they were traveling together from Los Angeles, a known distribution point for drugs destined for Hawaii, and that each of them had lied about their coordinated activity. It was reasonable, then, for her to infer that, when one of them was carrying drugs, the other two would be joined in the activity. She had served for more than 8 years at the airport, investigating drug trafficking, and had participated in more than 150 drug investigations. When she saw the contents of Barrera's bag and noted its size, shape, and covering and knew that such duct tape covering was favored by drug dealers, she had probable cause to believe that Barrera was carrying drugs. The probable cause that was sufficient for her to arrest Barrera also was sufficient for her to arrest the two men she had observed acting in concert with him.

**AFFIRMED.**