UNITED STATES of America,
Plaintiff–Appellee,

v.

Indalecio IBARRA, Defendant–
Appellant.

No. 02–30389.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 9, 2003.

Filed Sept. 26, 2003.

**712**

Tonia L. Moro, Assistant Federal Public Defender, Medford, OR, for the defendant-appellant.

Judith R. Harper, Special Assistant United States Attorney, Medford, OR, for the plaintiff-appellee.

Before HALL, Senior Circuit Judge, GRABER, and GOULD, Circuit Judges.

## OPINION

CYNTHIA HOLCOMB HALL, Senior Circuit Judge.

Indalecio Ibarra appeals his conviction for possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1). Ibarra argues that the district court erred by denying his motion to suppress evidence obtained as a result of the seizure and search of his automobile conducted by Oregon state police. Ibarra argues that both the seizure and subsequent search of his vehicle were unreasonable under the Fourth Amendment.

We have jurisdiction under 28 U.S.C. § 1291. Because there was no violation of the Fourth Amendment, we **AFFIRM.**

### FACTS

In the early morning hours of February 20, 2001, Ibarra was pulled over for speeding by Oregon state Trooper Pam Gaither. At the spot where Ibarra was pulled over, another police officer, Detective David Beck, happened to be present with his drug-detecting dog, Beepers. As Trooper Gaither began to write Ibarra a citation, Detective Beck walked Beepers around the exterior of Ibarra's Isuzu Trooper. Beepers indicated that the odor of narcotics was emanating from the Isuzu. Trooper Gaither and Detective Beck attempted to get Ibarra to consent to a search but he did not appear to understand English. Gaither then gave Ibarra a consent form in Spanish stating that Ibarra was giving the police consent to search the vehicle. Ibarra signed the form. The officers searched the vehicle and allowed Beepers to enter it. Beepers alerted to an area in the back of the Isuzu where he had alerted when he was outside the car. The officers found a bag with large amounts of cash in it. Beepers then alerted to an area in the middle console of the car. The console was taken out and the officers found a load of methamphetamine.

Although Trooper Gaither had probable cause to believe that Ibarra was violating the speed limit, her real interest in Ibarra's car had nothing to do with enforcing the state's traffic laws. It was also no coincidence that Detective Beck happened to be waiting with his drug-detecting dog in the exact spot where Trooper Gaither pulled Ibarra over. In fact, the whole incident had been planned hours in advance in coordination with DEA agents from Washington and Oregon.

In the years preceding Ibarra's arrest, the DEA was conducting an investigation into a number of groups who were manufacturing large quantities of methamphetamine in the Seattle area. The DEA believed that one of these groups was transporting methamphetamine from Washington to San Jose, California.

On February 15, 2001, DEA Agent Richard Hudon intercepted a call, pursuant to a court-authorized wiretap, that indicated that people were waiting to pick up a shipment of methamphetamine at a place familiar to Agent Hudon. Agent Hudon traveled to the place and saw a bag being

"hefted" from one car to a Chevy Tahoe. The Tahoe was driven to a house at 315 Davis Lake Road and entered the garage. The garage door closed. The Tahoe was driven out of the garage about 15 minutes later.

On February 19, 2001, Agent Hudon was observing the house on Davis Lake Road and saw a gold-colored Isuzu Trooper in the driveway. The Chevy Tahoe was parked on the street. Hudon then saw one of the men who was in the Chevy Tahoe on February 15 enter the house. The man left the house with appellant Ibarra. Ibarra then got into the Isuzu and drove it into the garage. About an hour later, Ibarra drove out of the garage with his wife and some others. The Isuzu had California license plates registered in the name of Indalecio Ibarra. Agent Hudon recognized this name from a prior investigation into a methamphetamine lab. The DEA followed the car by air as it began driving south toward Oregon.

Shortly thereafter, Oregon police were notified that an Isuzu Trooper was driving through the state and the DEA suspected that it was carrying methamphetamine. Detective Beck was informed that the Isuzu would be driving through Medford where Beck and Beepers were located. Beck talked with several federal and state officials about a plan to intercept the Isuzu driven by Ibarra. The officials decided to follow the Isuzu when it entered the Medford area and wait for it to violate a traffic law. The car would then be pulled over by Trooper Gaither. Detective Beck would be present at the scene with Beepers. As we now know, everything went according to plan.

Ibarra moved to suppress the evidence obtained by the search. The district court denied the motion, holding that Ibarra had consented to the search and that, in any event, the officers had probable cause to search the car. The court also held that the fact that the stop was pretextual was irrelevant to the reasonableness of the initial seizure.

Ibarra pleaded guilty, preserving his right to appeal. This appeal followed.

## DISCUSSION

■ Ibarra does not contest that the government had probable cause to believe he violated traffic laws.[1] The government does not contest that the stop of Ibarra's automobile, although made on the pretext of attempting to enforce traffic laws, was actually made for the purpose of investigating whether Ibarra had contraband in his vehicle. We are therefore presented with the question of whether an otherwise reasonable traffic stop is rendered unreasonable because it was made as a pretext to investigate suspected drug activity. The issue, of course, is not novel. It was addressed and resolved by a unanimous Supreme Court in *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

In *Whren,* plainclothes police officers observed the petitioners stop at an intersection in a "high drug area" for 20 seconds, an "unusually" long time. *Id.* at 808, 116 S.Ct. 1769. When petitioners sped off, the police followed in their unmarked car. When petitioners' vehicle stopped at a red light, a plainclothes officer got out of his car and went to the petitioners' vehicle and

---

1. Police may make an investigative traffic stop based on "reasonable suspicion." *United States v. Lopez–Soto,* 205 F.3d 1101, 1105 (9th Cir.2000) ("[T]he Fourth Amendment requires only reasonable suspicion in the con- text of investigative traffic stops."). We use the term "probable cause" because the parties agree that Trooper Gaither had probable cause to believe a traffic violation occurred.

told them to pull over to the side. He then observed drugs in plain view and arrested the men. *Id.* at 808–09, 116 S.Ct. 1769. The Supreme Court flatly rejected any argument that would look beyond whether or not the police officer had probable cause to make a traffic stop. The Court rejected an approach that would consider the subjective motives of an individual officer. *Id.* at 811–13, 116 S.Ct. 1769. The Court rejected an approach that would consider "whether the officer's conduct deviated materially from usual police practices, so that a reasonable officer in the same circumstances would not have made the stop for the reasons given." *Id.* at 814, 116 S.Ct. 1769.

Despite the similarity to the case before us, Ibarra argues that *Whren* is not on point. Ibarra makes a nonfrivolous argument based on *Whren* that, as far as we know, has not been addressed by any court. Ibarra latches on to a seemingly ambiguous passage in the otherwise unambiguous opinion in *Whren*. Specifically, Ibarra draws our attention to the following language:

> For the *run-of-the-mine case,* which this surely is, we think there is no realistic alternative to the traditional common-law rule that probable cause justifies a search and seizure.

*Id.* at 819, 116 S.Ct. 1769 (emphasis added). Ibarra argues simply that his case is not "run-of-the-mine." Webster's defines "run-of-the-mine" as "ordinary, mediocre, run-of-the-mill." [2] Webster's Third Inter-

national Dictionary, Unabridged, 1990 (1980).

■ Ibarra implies that *Whren* leaves the door open for courts to invalidate otherwise reasonable searches or seizures when there is extraordinary evidence of pretext. We reject this. If nothing else, *Whren* foreclosed the possibility that a search or seizure may be invalidated solely because of the subjective intentions of a state officer:

> [Supreme Court] cases foreclose *any* argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved. We of course agree ... that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play *no role* in ordinary, probable-cause Fourth Amendment analysis.

*Id.* at 813, 116 S.Ct. 1769 (emphasis added).[3] *See also United States v. Hudson,* 100 F.3d 1409, 1414–16 (9th Cir.1996) (fact that arrest warrant may have been sought only on pretext to enter appellant's home to search for evidence of crime, unrelated to arrest warrant, is irrelevant to whether a search is reasonable).

■ Returning to the passage upon which Ibarra makes his argument, the Su-

---

**2.** The term was first used in 1903. It refers to raw material, of different grades and qualities, as it exists in a mine before sorting. The more common "run-of-the-mill" was first used in 1930 and probably derives from "run-of-the-mine" and the even less-common "run-of-the-kiln." Webster's Collegiate Dictionary, 1032 (9th ed.1985) (listing dates terms were first used); *see also Weil v. B.E. Buffaloe & Co.,* 251 Ky. 673, 65 S.W.2d 704, 710 (1933) (referring to type of tile as "common or run-

of-kiln"); William Safire, *On Language; The Vapors,* N.Y. Times, March 24, 2002, § 6 at 24 (commenting on the Supreme Court's use of "mine" analogies and explaining that "mine-run" is a "variant of 'run of the mill' and 'run of the kiln' [and] came out of the bituminous coal industry").

**3.** Ibarra does not argue that he was pulled over on account of his race.

preme Court's language certainly presupposes that there is some set of cases where a search or seizure cannot be justified on probable cause alone. Lying outside of this set of cases is the "run-of-the-mine" case, i.e., the ordinary case that is governed by "the traditional common law rule that probable cause justifies a search and seizure." *Whren*, 517 U.S. at 819, 116 S.Ct. 1769. The only set of cases the Supreme Court identified in *Whren* where probable cause alone did not justify a search or seizure were those cases where "searches or seizures [were] conducted in an extraordinary manner, unusually harmful to an individual's privacy or even physical interests—such as, for example, seizure by means of deadly force, unannounced entry into a home, entry into a home without a warrant, or physical penetration of the body." *Id.* at 818, 116 S.Ct. 1769 (citations omitted). We therefore hold that it was this category of cases to which the Supreme Court referred as not "run-of-the-mine." As this case does not involve a search or seizure conducted in "an extraordinary manner," we reject Ibarra's argument that his is not a "run-of-the-mine" case.

■ We also reject Ibarra's argument that the fact that Detective Beck walked a drug-sniffing dog around the exterior of Ibarra's automobile somehow rendered the seizure unreasonable. Ibarra does not argue that the presence of the dog lengthened the time of the seizure beyond what is typical in ordinary traffic stops. Rather, he argues that the presence of the dog

alone renders the seizure unreasonable. In *United States v. Place*, the Supreme Court stated that the use of a drug-sniffing dog is not a search.[4] 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); *see also United States v. Beale*, 736 F.2d 1289, 1291 (9th Cir.1984) (en banc). Since *Place* informs us that the use of a drug-sniffing dog does not, by itself, raise any Fourth Amendment issues, it does not render the seizure at issue in this case unreasonable. *Cf. City of Indianapolis v. Edmond*, 531 U.S. 32, 40, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) ("The fact that officers walk a narcotics-detection dog around the exterior of [a] car ... does not transform the seizure into a search.... [A]n exterior sniff of an automobile does not require entry into the car and is not designed to disclose any information other than the presence or absence of narcotics.") (citing *Place*, 462 U.S. at 707, 103 S.Ct. 2637).

■ Finally, the search of the interior of Ibarra's car was not unreasonable. Officers may search an automobile so long as they have probable cause. No warrant is necessary because of the so-called "automobile exception" to the Fourth Amendment's warrant requirement. *California v. Acevedo*, 500 U.S. 565, 569, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991). Whether there is probable cause to support the warrantless search of an automobile is a mixed question of law and fact reviewed *de novo*. *Ornelas v. United States*, 517 U.S. 690, 696–97, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). We agree with the

---

4. Ibarra's argument that *Place* is not good law in light of *Kyllo v. United States*, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), is an argument we lack power to resolve. Despite the fact that Justice Stevens' dissent argued that the Court's opinion in *Kyllo* was inconsistent with *Place, id.* at 47–48, 121 S.Ct. 2038 (Stevens, J., dissenting), the Court did not expressly overrule *Place*. We are there-

fore bound by *Place*, unless and until the Supreme Court instructs us to the contrary. *See Hohn v. United States*, 524 U.S. 236, 252–53, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality.").

district court that the officers had probable cause to search Ibarra's vehicle.

■ Probable cause to search exists when the known facts and circumstances are sufficient to warrant a reasonable person to conclude that contraband or evidence of a crime will be found. *Id.* at 694, 116 S.Ct. 1657. Before searching Ibarra's car, Trooper Gaither and Detective Beck were aware of what the DEA investigation in Washington had uncovered regarding Ibarra's vehicle. Those facts are summarized above.

■ After Ibarra was pulled over by Trooper Gaither, Detective Beck walked his drug-detecting dog, Beepers, around the car. Beck first took Beepers to the back of Ibarra's car. He did this because there were wind gusts blowing and wind "can tend to be a benefit with scent." Beepers immediately did an "area alert." An area alert is when a dog detects the odor of narcotics in the area. Beepers then started scratching at the door of the Isuzu Trooper. This scratching is consistent with a "specific alert" where a dog bites or scratches at the source of odor trying to get as close to it as possible. According to Detective Beck, this did not necessarily mean that there were narcotics in the vehicle but that the scent of narcotics was within the vehicle.[5]

Based on the foregoing, we conclude that there was probable cause to search the car. The facts known to Trooper Gaither and Detective Beck, coming from the DEA, coupled with the fact that Detective Beck saw Beepers make a specific alert indicating that the dog smelled the odor of narcotics emanating from Ibarra's vehicle, would lead a reasonable officer to

believe that narcotics would be found inside the vehicle.[6]

#### CONCLUSION

Since the officers did not violate the Fourth Amendment, the district court correctly denied Ibarra's motion to suppress.

**AFFIRMED.**

---

5. We are completely unconvinced by Ibarra's attack on Detective Beck's credibility.

6. In light of this finding, we need not address the more difficult issue of whether Ibarra consented to the search of his vehicle.