**UNITED STATES of America, Plaintiff,**

v.

**Omega FLORES, Patricia Zaragoza, Defendant.**

**No. CR 04–904–PCT–DGC.**

United States District Court, D. Arizona.

Jan. 5, 2005.

---

Jeffrey Allen Williams, Federal Public Defender's Office, Phoenix, AZ, Daniel L. Castillo, Law Office of Daniel L. Castillo, Tampa, FL, for Defendant.

Brian Gail Larson, U.S. Attorney's Office, Phoenix, AZ, for Plaintiff.

## ORDER

CAMPBELL, District Judge.

Defendants Patricia Zaragoza and Omega Flores have been charged with possession with intent to distribute more than 500 grams of methamphetamine. The methamphetamine was found concealed in Zaragoza's car during a traffic stop. Zaragoza filed a motion to suppress physical evidence and statements obtained as a result of the traffic stop (Doc. # 31), which Flores joined (Doc. # 25). The Government filed a response (Doc. # 39). The Court held an evidentiary hearing on December 17, 2004, and heard testimony from the Arizona Department of Public Safety ("DPS") officer who stopped Defendants. The Court also viewed a video and audio recording of the traffic stop made by a camera in the officer's patrol car. The Court concludes that the traffic stop and search of Defendants' vehicle did not violate their constitutional rights.

### I. Factual Background.

On August 21, 2004, Defendants were traveling east on Interstate 40 outside of Flagstaff, Arizona. Flores was driving the 1999 Acura Sedan. DPS Officer Carlson was stationed in the median near milepost 203, monitoring east-bound traffic. As Defendants' car approached, Carlson's radar showed they were traveling 74 miles per hour, nine miles per hour over the posted speed limit. Carlson pursued Defendants' car and pulled it over at approximately milepost 205. The video camera in Carlson's patrol car was activated with his lights and siren and recorded the entire stop.

Carlson approached the car on the passenger side and requested Flores' license and the vehicle registration. As he stood

at the car window, he noticed a strong odor of air fresheners. Carlson testified from his training and experience that air fresheners often are used by drug smugglers to mask the smell of narcotics. Carlson observed that Flores' hand was shaking visibly as she handed him her license, that Zaragoza's hand was shaking as she handed him the registration, and that the car was very clean inside and out, an unusual condition for cars on an interstate trip. Carlson also noticed that Zaragoza and Flores laughed nervously—what he described as a "false laugh"—when he approached them.

Carlson asked Flores to come back to his patrol car. She complied. He stated that he was going to "cut" her a "break" and only issue a warning. Carlson testified on the basis of more than 7,000 traffic stops that drivers usually begin to relax when told they will receive a warning instead of a citation. Flores did not. Carlson testified that she seemed to grow more nervous. Even though it was a cool day, one which later caused Defendants to request a blanket and jacket, Carlson noticed beads of sweat on Flores' forehead.[1]

While completing the warning paper work, Carlson asked Flores where she was traveling from. She said she was coming from seeing her brother in New Mexico, a response that made little sense given her eastbound direction on Interstate 40. Flores corrected her response and said she was coming from Phoenix and on her way to visit her brother near Roswell, New Mexico. Carlson asked what she had been doing in Phoenix; she said she had been visiting family. Carlson asked who owned the car; she said it was owned by Patricia, the passenger. When asked for Patricia's

last name, Flores hesitated and looked away, as if trying to think of what to say, and then responded that Patricia's last name was Corona. This also struck Carlson as odd because the name on the registration was Patricia Zaragoza. Carlson asked Flores if Patricia recently had been married; Flores responded that she was not sure, another odd response from someone supposedly traveling with a friend. In response to a question about where they had stayed in Phoenix, Flores said Motel 6.

Each of Carlson's questions was asked in a friendly, conversational style as Carlson completed paper work. Carlson asked Flores to remain by his patrol car while he talked to Patricia, the vehicle owner. He then approached the car on the passenger side and again detected a strong odor of air freshener. Zaragoza appeared nervous and had her identification out even though Carlson had not requested it. In response to Carlson's questions, Zaragoza gave several answers that were inconsistent with those given by Flores. Zaragoza said that they were going to Florida (not New Mexico) and did not plan to stop along the way, that they had been in Phoenix visiting friends (not family), and that they had stayed with friends (not in a Motel 6). Carlson walked around the car and checked the plates, which he previously had noticed were from Florida, and then proceeded to the driver's side where he checked the vehicle identification number (VIN). While doing so he noticed that the car showed more than 130,000 miles on the odometer, unusually high mileage for a five-year-old vehicle, but mileage consistent with a vehicle used in drug smuggling.

Carlson walked back to his patrol car, gave Flores the written warning, returned

---

1. Defendants argue that Carlson had never met Flores or Zaragoza before the stop and therefore had no basis for determining whether they were nervous. Carlson testified, however, that he has made more than 7,000 traffic stops, each time observing the motorists' demeanor, and that Defendants clearly were nervous. The Court finds this testimony to be credible.

her license and the registration, suggested that she slow down in her driving, and told her to "take care." As Flores started walking back to the car, Carlson asked if she would answer some additional questions. Flores agreed. Carlson then explained that Arizona has drug trafficking problems and asked if she was transporting drugs. Flores said no. He asked if he could search the car. Flores responded that she did not own the car, but that she would consent to the search. Carlson then asked Zaragoza if he could search the car, and she agreed. He asked her a second time, and she agreed a second time. Carlson then asked Zaragoza and Flores to read a written consent to search form, make sure they understood it, and sign it if they agreed to the search. Both Defendants read and signed the form.

Zaragoza's six year older daughter was in the back seat of the car. Carlson had the child step out while the car was searched. After a thorough search, during which Carlson was joined by another DPS officer, the officers found 16 packages containing 7.72 kilograms of methamphetamine in panels on either side of the rear passenger seat. Carlson also found $5,000 in cash and plane tickets showing that Flores and Zaragoza had flown to Phoenix the previous day.

Defendants were placed under arrest. While transporting Defendants to the Coconino County jail, Carlson overheard Zaragoza say to Flores "[t]hey told my husband that he would get ten years for the same thing and he didn't get anything."

## II. The Traffic Stop and Search Were Constitutional.

"The constitutionality of an investigative detention is judged under the framework established in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), requiring that the scope of an investigative detention 'must be carefully tailored to its underlying justification ... and may last no longer than is necessary to effectuate the purpose of the stop.'" *United States v. Chavez–Valenzuela*, 268 F.3d 719, 724 (9th Cir.2001) (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). An officer must initially restrict the questions he asks during the stop to those reasonably related to the justification for the stop, and may expand their scope only if he notices particularized, objective factors arousing his suspicion. *See id.; U.S. v. Diaz–Juarez*, 299 F.3d 1138, 1141 (9th Cir.2002).

### A. The Initial Stop Was Valid.

■ Carlson testified that his radar clocked Defendants traveling 75 miles per hour in a 65–mile–per–hour zone. He also testified that he confirmed the accuracy of his radar gun before and after his shift that day. This evidence is not disputed.[2]

A law enforcement officer may stop a driver without violating the Fourth Amendment when the officer has probable cause to believe that a traffic violation has occurred. *See Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Carlson clearly had probable cause in this case to believe Defendants were speeding. The stop, therefore, was valid.

### B. The Questioning and Other Actions During the Stop Did Not Violate Defendant's Fourth Amendment Rights.

Having made a valid stop of Defendants' car, Carlson was permitted to ask ques-

---

**2.** Carlson told Defendants in the video tape that he clocked them going 74 miles per hour, but the Court does not regard this discrepancy as significant. Flores admits on the video tape that she was going 75 miles per hour.

tions and take other actions reasonably related to the purpose of the stop. *See United States v. Murillo*, 255 F.3d 1169, 1174 (9th Cir.2001). The Fourth Amendment was violated only if he expanded the stop beyond its permissible scope without a suspicion based on particularized, objective factors. *See Chavez–Valenzuela*, 268 F.3d at 724. The Court's Fourth Amendment analysis must ultimately be based on the totality of the circumstances involved in the stop. *See United States v. Arvizu*, 534 U.S. 266, 273–74, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002); *United States v. Hernandez*, 313 F.3d 1206, 1212 (9th Cir.2002). Initially, however, the Court will address each element of the stop discussed by the parties in briefing and at the hearing.

■ Carlson began by asking Flores for her driver's license and the vehicle registration. Such a request is permitted under the Fourth Amendment as part of a traffic stop. *See Chavez–Valenzuela*, 268 F.3d at 724.

■ Carlson asked Flores to exit the vehicle and come back to his patrol car. He testified credibly during the hearing that he routinely takes this step for his own safety; he explained that dangerous situations can arise if recently stopped persons are left to confer out of his presence. Reasonable measures undertaken for officer safety do not violate the Fourth Amendment. *See Terry*, 392 U.S. at 23–24, 88 S.Ct. 1868. In addition, the Ninth Circuit has held that separating individuals for questioning does not violate their Fourth Amendment rights. *United States v. Bautista*, 684 F.2d 1286, 1289–91 (9th Cir.1982).

■ Carlson asked Flores where she was traveling, where she had been, and the reasons for her travel. Such questions are permissible as part of a traffic stop. *United States v. Pruitt*, 174 F.3d 1215, 1220 (11th Cir.1999) (implying questions about travel plans are permissible); *United States v. Hill*, 195 F.3d 258, 268 (6th Cir. 1999) (stating that questions about a driver's purpose for traveling were reasonably related to a traffic stop for speeding); *Chavez–Valenzuela*, 268 F.3d 724 n. 4 (citing *Pruitt* and *Hill* favorably on this point).

■ After talking with Flores, Carlson returned to the car to confirm the registration with Zaragoza and check the VIN. This step, like checking the driver's license, is a reasonable part of a traffic stop. *See New York v. Class*, 475 U.S. 106, 111–14, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986).

■ Carlson asked Zaragoza questions while doing so. Zaragoza responded voluntarily. The Ninth Circuit has observed that "[s]ometimes the officer will communicate with others, either police or private citizens, in an effort to verify the explanation tendered[.]" *Bautista*, 684 F.2d at 1290 n. 3. Defendants contend that the questioning of Zaragoza was not reasonably related to the traffic stop—that Carlson had no reasonable basis for asking a passenger anything during the stop. But Carlson's questioning of Zaragoza was consensual, was with the vehicle owner, and Zaragoza responded voluntarily. The Court cannot conclude that the Fourth Amendment prohibits an officer from conferring with a vehicle's owner about travel matters during a traffic stop. *See Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *United States v. Ayon–Meza*, 177 F.3d 1130, 1133 (9th Cir. 1999).

■ Following completion of these steps, Carlson issued the written warning to Flores, returned her license and vehicle registration, and told her to "take care." She turned and began walking back to the vehicle. The entire stop to this point had taken less than nine minutes. "[T]he Supreme Court specifically [has] refused to

set a definitive rule on the time limit of a lawful investigative stop, finding instead that the circumstances of each case must be considered." *United States v. Torres–Sanchez,* 83 F.3d 1123, 1128 (9th Cir.1996) (citing *United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)). The circumstances of this case, as captured on video tape, show that Carlson did not delay unreasonably or take an unnecessary amount of time to issue the warning. *See id.* at 1127–29 ("[U]pon review of the totality of the circumstances, we find Sanchez being seated in [the] patrol car twenty minutes to be reasonable[.]").

Defendants assert that the traffic stop ended once Carlson obtained the license and registration—that nothing more was needed to complete the warning—and that the actions he took thereafter exceeded the permissible limits of the traffic stop. The Court disagrees. The minutes from the beginning of the stop to issuance of the warning were used to complete steps reasonably related to the stop: obtaining the license and registration, checking Flores' identity by radio, confirming Zaragoza's ownership of the car, checking the VIN, and completing the paperwork required for the warning. Each of these actions reasonably can be viewed as part of a single traffic stop. *See id.* at 1129. The Court will not parse them as Defendants suggest. *See United States v. Sokolow,* 490 U.S. 1, 1585–87, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) ("[I]n evaluating the validity of a stop[,] . . . we must consider 'the totality of the circumstances—the whole picture.' ").

■ By the time he issued the warning, Carlson had identified particularized, objective factors that supported a reasonable suspicion and that justified extending the stop. These included Defendants' nervousness, the strong odor of air fresheners, the clean condition of the car on a long road trip, the high mileage on a relatively new vehicle, the odd responses by Flores to Carlson's questions and the inconsistent answers provided by Zaragoza, and the fact that Defendants were traveling from a known drug source area to a known drug distribution area. *See, e.g., United States v. Murillo,* 255 F.3d 1169, 1174 (9th Cir. 2001) (nervousness); *United States v. Perez,* 37 F.3d 510, 514 (9th Cir.1994) (nervousness and traveling from a drug source area to a distribution area); *United States v. Quintero–Barraza,* 78 F.3d 1344, 1347 (9th Cir.1995) (air fresheners to mask the odor of drugs); *United States v. Rodriguez–Arreola,* 270 F.3d 611, 615 n. 10 (8th Cir.2001) (clean interior with no debris on a purported interstate trip); *United States v. $189,825 in U.S. Currency,* 8 F.Supp.2d 1300, 1313 (N.D.Okla.1998) (a new vehicle with high mileage); *United States v. Oba,* 978 F.2d 1123, 1128 (9th Cir.1992) (inconsistent answers and vague explanations). These particularized, objective factors, taken together, supported Carlson's reasonable suspicion that drugs were being transported and justified extension of the stop to inquire about possible drug trafficking. *See id; Royer,* 460 U.S. at 497, 103 S.Ct. 1319; *Ayon–Meza,* 177 F.3d at 1133.[3]

---

**3.** The Government argues that Defendants were free to leave once Flores received her warning and license and was wished a good day, and that any answers provided by Defendants thereafter were entirely consensual. But Carlson did not tell Flores she was free to leave, his lights were still flashing, and he paused only briefly between wishing her a good day and continuing his questioning. The Court concludes that Carlson's questions after issuing the warning constituted an extension of the investigative stop, but that the extension was supported by particularized and objective factors supporting a reasonable suspicion.

Defendants assert that each of these factors, taken alone, could be entirely innocent, but this fact does not render the stop unconstitutional. Officer Carlson testified that it was the cumulative effect of these factors that gave rise to his suspicion of drug trafficking, and Courts repeatedly have held that the totality of circumstances must be considered. *See Arvizu*, 534 U.S. at 273–74, 122 S.Ct. 744; *Hernandez*, 313 F.3d at 1212. The Court finds that Carlson's suspicion was reasonable and based on particularized, objective factors.

Defendants argue that Zaragoza's boyfriend and child are in fact named Corona, consistent with Flores' answer, and that Zaragoza purchased the car only months earlier with 127,000 miles on the odometer. But these facts were not known to Carlson at the time of the stop. The question to be addressed in this motion is not whether the factors relied on by Carlson proved to be entirely accurate, but whether they were objective, particularized, and sufficient to support a reasonable suspicion based on the totality of the circumstances at the time. The Court concludes that Carlson's reliance on the high mileage of the car and the apparent error of Flores regarding Zaragoza's last name were objectively reasonable given the information he possessed at the time. *See $189,825 in U.S. Currency*, 8 F.Supp.2d at 1313; *Oba*, 978 F.2d at 1128.

## C. Defendants' Consent to Search Their Vehicle Was Valid.

■ Defendants first agreed verbally to the search and then signed a written consent. The consent form specifically noted that Defendants were not required to consent, that any evidence found as a result of the search could be used against them in civil or criminal proceedings, that they could withdraw their consent at any time,

that they could consult with an attorney before the search, and that they could require that a search warrant be obtained. Carlson asked Defendants to read the form, make sure they understood it, and sign if they agreed to the search. Each Defendant read the form and signed it.

"An individual may waive [her] Fourth Amendment rights by giving voluntary and intelligent consent to a warrantless search of [her] person, property, or premises." *Torres–Sanchez*, 83 F.3d at 1129. To determine whether consent is voluntary, five factors are considered: (1) whether the defendant was in custody; (2) whether the arresting officer had his gun drawn; (3) whether Miranda warnings had been given; (4) whether the defendant was told she had a right not to consent; and (5) whether the defendant was told that a search warrant could be obtained. *Id.* These factors lead the Court to conclude that Defendants' consent was voluntary. Defendants were not in custody (a point that will be discussed further below). Carlson never drew his gun. Miranda warnings were not given and were not necessary because Defendants were not in custody. Defendants were told by the form that they had the right not to consent.[4] The form stated that Defendants could insist on a search warrant, but Carlson never threatened to get such a warrant if they declined to consent. Moreover, as the video tape makes clear, Carlson's actions were cordial and pleasant. Defendants consented to Carlson's search of their car and thereby waived any Fourth Amendment objection they might have had to the search.

## D. Carlson's Secondary Motive.

■ Having concluded that the investigatory stop was objectively reasonable and that Defendants' consent to the search was

---

4. Carlson was not required verbally to tell Defendants that they could decline to consent.

*Ohio v. Robinette*, 519 U.S. 33, 39–40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996).

voluntary, the Court's inquiry normally would end. In this case, however, there is an additional issue the Court must address. Carlson candidly admitted during his testimony that some of his actions during the stop were designed to look for evidence of drug trafficking. He testified, for example, that he watched Flores to see if her nervousness subsided once she was informed that she would receive only a warning.

Defendants contend that Carlson could take no action with an intent of investigating drug activities—even if the actions were also reasonably related to the traffic stop—unless he first had a reasonable and articulable suspicion that Defendants were carrying drugs. Because Carlson did not have such a suspicion at the start of the traffic stop, Defendants argue, his handling of the stop violated the Fourth Amendment.

For the reasons explained above, Carlson conducted an appropriately limited traffic stop, during which he made observations that justified extension of the stop into an inquiry about possible drug trafficking. The fact that his actions during the traffic stop were undertaken in a manner that would permit him to detect additional evidence of drug activity, if such activity was afoot, does not change the fact that his actions were reasonably related to the traffic stop. *See Whren,* 517 U.S. at 811–13, 116 S.Ct. 1769 ("Subjective intentions play no role in ordinary, probable cause Fourth Amendment analysis."); *United States v. Robinson,* 414 U.S. 218, 221 n. 1, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (holding that traffic-violation arrest was not invalid because it was "a mere pretext for a narcotics search"); *United States v. Ibarra,* 345 F.3d 711, 714 (9th Cir.2003) (same).

Prudent police officers remain on the lookout for criminal activity at all times, whether interacting with citizens in the normal course of their patrol activities or conducting otherwise lawful traffic stops. *See Terry,* 392 U.S. at 22–23, 88 S.Ct. 1868 (discussing governmental interest in crime prevention and detection and stating that it would have been "poor police work indeed" for an experienced police officer not to further investigate Terry's suspicious behavior). Certainly they may tailor their actions to facilitate detection of criminal activity, provided the tailoring does not cause their actions to exceed Fourth Amendment bounds. Law enforcement officers would be seriously hampered in detecting criminal activity if every action, every observation, every question must first be supported by articulable suspicion. Certainly such suspicion is required for an officer to extend a traffic stop to inquire about specific criminal activity, but, so long as the traffic stop itself is made on a valid basis, otherwise reasonable traffic-stop activities may be undertaken with a view toward detecting additional evidence of a crime without running afoul of constitutional limitations. *See, e.g., id.; Whren,* 517 U.S. at 811–13, 116 S.Ct. 1769; *Robinson,* 414 U.S. at 221 n. 1, 94 S.Ct. 467; *Ibarra,* 345 F.3d at 714; *United States v. Escamilla,* 301 F.3d 877, 880 (8th Cir.2002) ("[I]t is well-settled that any traffic violation provides a police officer with probable cause to stop a vehicle, even if the officer conducted the valid traffic stop as a pretense for investigating other criminal activity."); *United States v. Ferguson,* 8 F.3d 385, 392 (6th Cir.1993) (holding that "a traffic stop, supported by probable cause, of a vehicle to which the officer also has suspicions of more nefarious activity, is not unreasonable because it is based at least in part upon other motivations").

## IV. Other Issues.

The parties have briefed the question of whether Defendants each have standing to challenge the vehicle search. Because the

Court finds the search to have been lawful, it need not resolve this issue.

Defendants also contend that Carlson's questions violated their constitutional rights because they were not given Miranda warnings. Such warnings are required, however, only for custodial interrogations. *See United States v. Crawford*, 372 F.3d 1048, 1059 (9th Cir.2004) ("An officer's obligation to administer *Miranda* warning attaches ... only where there has been such a restriction on a person's freedom as to render him 'in custody.' ") (citations omitted). Carlson's reasonable questioning of Defendants during the traffic stop, including his questions following issuance of the warning, were not custodial. Contrary to Defendants' arguments, the fact that Carlson pulled them over with flashing lights, conducted a traffic stop, and asked questions reasonably within the scope of the stop did not have the effect of placing them in custody for Miranda purposes. *See United States v. Butler*, 249 F.3d 1094, (9th Cir.2001) ("The case books are full of scenarios in which a person is detained by law enforcement officers, is not free to go, but is not 'in custody' for *Miranda* purposes. A traffic stop is not custody.") (citing *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). Moreover, the statement Zaragoza made to Flores while being transported to the Coconino County Jail, which was overheard by Carlson, did not violate Defendants' Miranda rights or right to counsel because it was entirely voluntary and not made in response to a custodial interrogation. *See United States v. Moreno–Flores*, 33 F.3d 1164, 1170 (9th Cir.1994) ("*Miranda* does not prohibit the use of a defendant's voluntary statements.").

**IT IS ORDERED** that Defendant Patricia Zaragosa's Motion for Joinder in Co–Defendant's Motions (Doc. # 35) is **granted.**

**IT IS ORDERED** that Defendant Omega Flores' Motion for Evidentiary Hearing and Oral Argument (Doc. # 32) is **granted.**

**IT IS FURTHER ORDERED** that Defendant Omega Flores' Motion to Suppress (Doc. # 31) is **denied.**